IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

JAN THOMAS,                          )
                                     )
                Plaintiff,           )
                                     )
        vs.                          )        Case No. 04-0626-CV-W-RED
                                     )
KANSAS CITY, MISSOURI, POLICE        )
DEPARTMENT, et al.,                  )
                                     )
                Defendants.          )


## ORDER

NOW before the Court is Defendants' Motion for Summary Judgment (Doc. 76), Defendants' Memorandum in Support of Summary Judgment (Doc. 77), Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment (Doc. 85), and Defendants' Reply Memorandum In Support of Summary Judgment (Doc. 88). For the reasons stated below, the Court finds that the Defendants' Motion for Summary Judgment is due to be granted in its entirety.

### I. Factual Background

Plaintiff began working for the Kansas City Police Department ("police department") on August 8, 1977 as a civilian clerk typist. Beginning in 1989, she worked in the Juvenile Unit ("the Unit") as an investigative typist on the evening shift. Sgt. Janet Hargarten ("Hargarten") became Plaintiff's direct supervisor in late 1996 or 1997. In 1999, Plaintiff transferred from the Unit to the East Property Crimes unit so that she could work the day shift. When she left the Unit, Plaintiff had a good working relationship with Hargarten and did not feel that Hargarten had mistreated her. Within a few months, Plaintiff asked Hargarten for permission to transfer back to her prior position in the Unit because she wanted her evening shift back.

Plaintiff knew that Hargarten would become her supervisor again, once she returned to the Unit. The security concerns and manpower problems were similar to when Plaintiff left the Juvenile Unit, but plans were being made to improve security. Hargarten approved Plaintiff's return to the Juvenile Unit in early 2000, and gave Plaintiff her old job back.

When Plaintiff returned to the Unit, Hargarten reviewed with her the office procedures and the Unit's vacation policy which limited vacations to no more than sixteen (16) consecutive days. Despite having been informed of the Unit's vacation policy, Plaintiff submitted a request on May 30, 2000, seeking twenty (20) consecutive days of vacation to be taken in September 2000. Hargarten denied this request and asked that the request be resubmitted. Plaintiff resubmitted a request for seventeen (17) days, which was approved, despite exceeding the maximum days allowed by the vacation policy. Plaintiff met with Hargarten on May 31, 2000, to discuss the vacation issue. Plaintiff raised concerns regarding the safety and security within the Juvenile Unit during this meeting. Plaintiff claims that Hargarten told her "to be very careful [about her] decision to file a grievance." Plaintiff also claims she was told to "stand up to" her husband and to think for herself.

On July 26, 2000, Plaintiff fell asleep at her desk during her shift. Her coworkers woke her up. Hargarten, the next day, asked Plaintiff to write up a "Form 191" to explain what had happened. Form 191 is an explanatory memorandum that was not viewed internally by the Police Department as disciplinary action. However, it can be used as a prelude to disciplinary action. Moreover, Plaintiff's form was referenced in her performance evaluation. Plaintiff was not formally disciplined for falling asleep at her desk. Plaintiff did fill out a form 191 memo and received a negative comment on her annual evaluation in regard to the incident. Her annual evaluation was "satisfactory" rather than "unsatisfactory."

2

On August 9, 2000, Plaintiff was late for a staff meeting. Similar to the sleeping incident mentioned above, Plaintiff was not formally disciplined but she was asked to fill out a Form 191 and the incident was referenced in her performance evaluation. Other employees of the Unit, including younger, male employees, fell asleep at work and were late to staff meetings but were not asked to prepare Form 191's by Hargarten.

On January 8, 2001, Plaintiff again submitted a vacation request that was in excess of the Unit's vacation policy. Plaintiff was asked to resubmit the request, but she did not do so. Plaintiff requested the excessive days based upon the official policy and her understanding of how it was historically applied. Plaintiff also acknowledged that a memorandum had been prepared by Hargarten and received by her which sought to modify the vacation policy and limit length of vacations due to manpower issues the Unit was having. No one else in the Unit had ever been granted the 32 consecutive days that Plaintiff requested. On February 20, 2001, Hargarten discussed the vacation request with Plaintiff and Captain Byron Price. Other issues discussed at this meeting were concerns allegedly voiced by detectives and that the Plaintiff's activities could be construed as creating a hostile work environment, internal affairs could be brought in, and that Plaintiff could be disciplined and/or fired. The detectives named as having concerns do not recall ever voicing concerns regarding Plaintiff. Plaintiff was also told at this time that her behavior in the Unit was unusual, and that if it did not stop it could support a hostile work environment claim by her coworkers and that she could be disciplined. Again, Hargarten advised Plaintiff "to stand up to [Plaintiff's] husband and think" for herself. Hargarten reminded Plaintiff about being careful regarding the filing of a grievance.

Plaintiff's evaluation covering the period from May 5, 2000 to May 5, 2001 included

Case 4:04-cv-00626-RED   Document 106   Filed 01/05/06   Page 3 of 21

comments regarding Plaintiff falling asleep and being late to a staff meeting. Plaintiff was given a satisfactory rating and Hargarten noted that Plaintiff should seek medical advice regarding the incidents. The only other rating Plaintiff could have received would be an "unsatisfactory" rating. Plaintiff agrees that the evaluation is true. Evaluations do not become part of the employee's permanent personnel file. The evaluation is replaced each year by the current evaluation however, the evaluations are retained in the Unit for two years.

On July 11, 2001, Thomas submitted a grievance to the police department. This grievance is based upon Thomas' concerns regarding the vacation policy, security and safety issues, and claims that her supervisor was treating her more harshly than others for the same infractions. Plaintiffs' grievances also included claims that there was increased monitoring of her activities by Hargarten, disparate treatment of her based on gender, and that Hargarten was creating self-serving memoranda criticizing Plaintiff.

On May 22, 2001, Plaintiff returned home from work and went to the emergency room. She felt ill and thought she was having a heart attack. Plaintiff was advised that she was experiencing "an anxiety reaction." The next day, Plaintiff sought treatment from Dr. Benard Judy, her primary physician. Dr. Judy told her she was experiencing "job-related stress." She was referred to Dr. Benard Sullivan, a psychologist. On May 23, 2001, Plaintiff also called the police department and stated that she "had been to the hospital the night before for stress" and that she had a doctor's appointment scheduled for the following day, May 24, 2001. Hargarten inquired about the "stress" that had caused her absence, and was told that Plaintiff would likely be to work on May 24, 2001. Plaintiff did not come to work on this date.

Plaintiff called Hargarten and told her Plaintiff would be off work until June 3, 2001.

4

Hargarten asked what work pressures were causing Plaintiff's stress, but Plaintiff did not answer. Dr. Sullivan excused Plaintiff from work through June 3, 2001 for "stress and anxiety related to work pressure." Plaintiff informed Hargarten that she had been cleared by Dr. Sullivan to return to work on June 18, 2001. Hargarten told Plaintiff she could not yet come back to work because Hargarten was recommending that Thomas be transferred to the Sick Leave Pool and undergo a fit for duty examination ("FFD"). Plaintiff was told that the Chief would contact her when he had approved a fit for duty examination.

Under the policy of the police department, an employee can be transferred to the sick leave pool when the sick leave is anticipated to last for 28 or more consecutive days. Hargarten anticipated that since Plaintiff would be out for at least 26 days before she could be evaluated, Plaintiff could easily go over the 28 day mark.

The personnel policy of the police department provides that "if a member exhibits symptoms of a psychological or psychiatric disorder which is believed to affect job performance or is life threatening in nature, the supervisor will submit a written request through the chain of command to the chief of Police recommending a psychological or psychiatric examination to evaluate the member's fitness for duty." Hargarten recommended that Plaintiff undergo a fitness for duty evaluation to so that the police department could resolve any work issues before Thomas returned to full duty. Hargarten noted that Plaintiff refused to discuss "work related stress" with anyone and that there would be "extreme pressure for the other detectives and reporting supervisor" if Plaintiff returned without an explanation and without evaluation.

Plaintiff stated that she was prepared to undergo the evaluation and it was her understanding that once it was completed KCPD would let her return to work. Plaintiff was referred to Dr. George

5

Harris to perform her fitness for duty evaluation. Dr. Harris is an independent, outside psychologist who spends about 80 percent of his professional time with clients from the Kansas City Police Department. Dr. Harris feels that when he does these evaluations his responsibility is to the police department. The Police Department's usual practice is to tell the doctor performing a fitness for duty examination what the employee's problem or issue is. The department did not provide Dr. Harris with any specific questions to direct to Plaintiff.

Dr. Harris knew that Plaintiff had been off work for a period of time due to anxiety and she attributed that anxiety solely to her job at the police department. Dr. Harris requested a medical release so that he could obtain her medical records. Plaintiff objected to the request, but eventually allowed him access to her records dated May 22, 2001 to July 10, 2001.

Dr. Harris wrote a report to the police department stating that he "cannot recommend that [Plaintiff] return to work until there is some indication of effective intervention for her anxiety or until her complaints about working conditions and vacations have been addressed and resolved."

When Dr. Harris received medical records from Dr. Judy, he found that Plaintiff had taken Prozac and Zoloft in the past. He was told Plaintiff was prescribed these medications for fatigue. Dr. Harris then requested that Plaintiff sign additional releases requesting a copy of the records from the time when Prozac and Zoloft were prescribed to Plaintiff, so that he could understand why she was given that medication at that time. Plaintiff refused to comply with this request and later stated it was because the records might contain information regarding her past infertility treatment. Plaintiff did ask Dr. Judy to prepare a letter to Dr. Harris explaining why the drugs had been prescribed. Dr. Judy prepared this letter and stated that the drugs had been for "fatigue." Dr. Harris was not willing to make his diagnosis based on Dr. Judy's summary and stated that he needed to see

the actual records.

Dr. Harris claims that he wanted the actual records from 1996 because there were conflicting pieces of information, and he was not sure Plaintiff was telling him the complete truth of her prior medical history. Dr. Harris asserts that the prior records would give him a more complete clinical picture of Plaintiff's condition. On August 28, 2001, Dr. Harris explained to the police department that he could not accept Dr. Judy's letter in lieu of the actual medical records and could not complete the fitness for duty examination. Dr. Harris stated that he could not allow Dr. Judy to "create my opinion regarding [Plaintiff's] psychological difficulties."

On October 1, 2001, Barbra Stuart, supervisor of the Employee Benefits section, called Plaintiff regarding the medical release for Dr. Harris. Plaintiff informed her that she would not be signing the release. Stuart then told Plaintiff that Stuart and Plaintiff would need to meet with Captain Lawler, Stuart's supervisor. Two days later, on October 3, 2001, the three met to discuss the release of Plaintiffs medical records to Dr. Harris. Although not expressly ordered to release the records, Plaintiff was advised that if she refused to cooperate with Dr. Harris, her employment would be terminated. An incident report was prepared on November 7, 2001 stating that at the October 3 meeting Plaintiff had been advised to release the records and that she had refused. Plaintiff signed this incident report.

The only mention in the medical record of any issues related to Plaintiff's infertility treatment was that she had a tubal ligation and reversal and was attempting to get pregnant. Plaintiff had disclosed this information to Dr. Harris on his initial questionnaire. Plaintiff also had conversations with co-workers, including Hargarten, regarding Plaintiff and her husband's desire to have children, although the specific treatments may have been misunderstood by some co-workers.

7

The police department terminated Plaintiff's employment effective December 4, 2001. Plaintiff was replaced by a younger female. Plaintiff took accumulated sick leave from May 23, 2001, until the effective date of her termination. Plaintiff does not suffer from any physical or mental disability.

Count I of Plaintiff's Second Amended Complaint alleges disability discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12201, *et seq.* ("ADA"). Plaintiff alleges that the fitness for duty evaluation, including the request for medical records and termination for failure to comply, violated the ADA. Count II of Plaintiff's Second Amended Complaint alleges discrimination on the basis of her age in violation of the Age Discrimination in Employment Act, 18 U.S.C. § 621, *et seq.* ("ADEA") by treating her less favorably than similarly situated younger employees. Count III of the Second Amended Complaint alleges discrimination on the basis of gender in violation of Title VII of the Civil Rights Act of 1967, 42 U.S.C. § 2000e, *et seq.* ("Title VII") by treating Plaintiff less favorably than similarly situated male employees. Count IV of the Second Amended Complaint alleges retaliation in violation of the ADA, ADEA, and Title VII after Plaintiff threatened to finally file a formal grievance. Count V alleges invasion of privacy under Missouri state common law through the request for medical records with her fitness for duty evaluation.

## II. Standard of Review

Rule 56(c) Federal Rules of Civil Procedure provides that summary judgment shall be rendered if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fry v. Holmes Freight Lines, Inc.*, 72 F.

Case 4:04-cv-00626-RED   Document 106   Filed 01/05/06   Page 8 of 21

Supp. 2d 1074, 1075 (W.D. Mo. 1999). When ruling on a motion for summary judgment, the court should view the facts in the light most favorable to the adverse party and allow the adverse party the benefit of all reasonable inferences to be drawn from the evidence. *See id.* (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Reed v. ULS Corp.,* 178 F.3d 988, 900 (8th Cir. 1999)).

Summary judgment is appropriate against a party who fails to make a showing sufficient to establish that there is a genuine issue for trial about an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Cunningham v. Kansas City Star Co.*, 995 F. Supp. 1010, 1014 (W.D. Mo. 1988) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

In the case where both parties have filed cross-motions for summary judgment, the legal standard does not change. Each motion must be evaluated independently, with facts viewed in a light most favorable to the nonmoving party. *See, e.g., St. Luke's Methodist Hosp. v. Thompson*, 182 F. Supp. 2d 765, 769 (N.D. Iowa 2001).

### III. Discussion

#### A. Discrimination in Violation of the ADA

Plaintiff brings her ADA claim under 42 U.S.C. § 12112(d)(4), which states that an employer covered by the statute shall not require a medical evaluation nor inquire into the disability status of an employee unless "such examination or inquiry is shown to be job-related and consistent with a business purpose." This requirement of the ADA applies to all employees, whether or not they have a disability. *Cossette v. Minnesota Power & Light*, 188 F.3d 964, 969 (8th Cir. 1999) (stating that the plain language of the ADA provides that all employees are protected by this section (d)(4)).

It is clear from the briefing of the parties that the true issue for summary judgment purposes is whether the fitness for duty examination ordered by Defendants is "job-related and consistent with

9

business purpose" as a matter of law. "Courts will readily find a business necessity if an employer can demonstrate that a medical examination or inquiry is necessary to determine . . . whether the employee can perform job-related duties when the employer can identify legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his or her duties." *Conroy v. New York State Dept. of Correctional Services*, 333 F.3d 88, 98 (2nd Cir. 2003). "Technical skills and experience are not the only essential requirements of a job." *Grenier v. Cyanamid Plastics,* 70 F.3d 667, 674-75 (1st Cir.1995); *Pesterfield v. Tennessee Valley Auth.*, 941 F.2d 437, 44-42 (6th Cir.1991) ("at least the ability to get along with supervisors and co-workers" was essential function of job as tool room attendant).

Moreover, in the case of a current employee, an employer has gained knowledge of that individual's abilities that may indicate a legitimate need to verify that individual employee's ongoing ability to perform his or her job. *Difazio v. Exelon Services, Inc.* 2004 WL 741563, *3 (D. Minn., 2004) citing *Conroy*, 333 F.3d at 98; *Porter v. United States Alumoweld Co.,* 125 F.3d 243, 246 (4th Cir.1997), *see also Grenier,* 70 F.3d 667, 678 (relying in part on *Brumley v. Pena,* 62 F.3d 277 (8th Cir.1995)). An employer is not required by the ADA to overlook or ignore such experience and knowledge. *Id.*

The facts are clear that Plaintiff had communicated to Defendants that she had concerns and had suffered from stress regarding the safety of her work situation to Hargarten. Shortly after Plaintiff was hospitalized, Defendants were told that the hospitalization was due to "work related stress." After Plaintiff had been treated for the adverse effect of this stress, she was to come back to exactly the same work environment. As Defendants' employee, Plaintiff had to interact with supervisors and co-workers. Plaintiff also had to deal with the public in the form of "angry parents"

10

who would confront her in the juvenile unit. Additionally, she would serve a security role as a "backup detective" where she would be responsible for calling in help if it was needed. Although Dr. Harris was not given specific directions by Defendants, he was given a memorandum outlining the concerns Defendants had regarding Plaintiff, and asking for Dr. Harris to determine if she was fit for duty. These facts demonstrate that the Defendants' request for a fit for duty evaluation was a legitimate, non-discriminatory concern for Plaintiff's ability to relate effectively with co-workers, supervisors, and the public as well as perform her job within the same work situation which had caused her leave of absence.

The parties each cite *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. 1999). In *Sullivan*, the Court held that an employer's request for an exam will be upheld if there is significant evidence that would cause a reasonable person to inquire as to whether the employee is still capable of performing his or her job. Defendants in this case were reasonable to inquire as to Plaintiff's ability to come back and perform her job. This job had previously hospitalized Plaintiff and caused an extended leave of absence. Defendant was logical in questioning Plaintiff's ability to function in the same environment again. The examination by Dr. Harris was focused on and related to this goal. He did not seek to go through all of Plaintiff's medical history and records, rather he only sought those related to her prior use of antidepressant medication. Thus, the request for the fitness for duty examination was based on a job-related necessity and for a business purpose. It was made clear to Plaintiff that if she continued to refuse to provide the requested medical records she would be terminated. Plaintiff continued to refuse and she was terminated. There is no evidence that indicates that if she had provided the records she still would have been terminated. Summary judgment on this point is due to be granted.

Case 4:04-cv-00626-RED   Document 106   Filed 01/05/06   Page 11 of 21

*B. Age Discrimination*

Plaintiff alleges discrimination based upon age because she was harassed, threatened, required to fill out a Form 191, required to undergo a fitness for duty examination, and actually terminated. The ADEA makes it unlawful for an employer to discriminate against an employee on the basis of age. 29 U.S.C. § 623(a)(1). A prima facie case of age discrimination as alleged by Plaintiff would include a showing that (1) she was a member of a protected class, (2) that she was meeting her employer's legitimate performance expectations, (3) that she suffered an adverse employment action, and (4) and that similarly situated employees outside the class were treated more favorably. *Adams v. West Publishing Co.*, 25 F.3d 635 (8th Cir. 1994). A prima facie case of discriminatory discharge under the ADEA requires Plaintiff to show that (1) she was at least 40 year old, (2) she was terminated, (3) she was meeting her employer's legitimate performance expectations, and (4) she was replaced with someone younger.

In presenting a case based upon age discrimination, a plaintiff may either present direct evidence of the claimed discrimination or he may make out a case of discrimination under the burden-shifting analysis for cases devoid of direct evidence. *See EEOC v. Liberal R-II Sch. Dist.*, 314 F.3d 920, 922-23 (8th Cir. 2002) (describing the analytical processes). If the plaintiff can produce "direct evidence" that age played a "motivating part" in employer's decision, then it is the employer's burden to convince the trier of fact that it is more likely than not that the decision would have been the same absent consideration of the illegitimate factor to limit liability. *See id.* (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989) (O'Connor, J., concurring in the judgment). If there is no such evidence, then the Court shall employ the Title VII-burden shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800-04 (1973). *See Bashara v. Black*

12

*Hills Corp.*, 26 F.3d 820, 823 (8th Cir. 1994) (applying *McDonnell* to ADEA cases).  Analysis of Plaintiff's claims under the Missouri Human Rights Act is identical to the ADEA analysis. *See Denesha v. Farmers Ins. Exch.*, 161 F.3d 491, 497 (8th Cir. 1998).

After reviewing the briefs and exhibits in this case, it is clear that summary judgment is appropriate on this point.  Plaintiff appears to allege two discriminatory acts, but does not appear to present any direct evidence of discrimination.  Her first alleged discriminatory act is  the preparation of the 191 forms to detail the incidents of her sleeping on the job and arriving late for a staff meeting.  Plaintiff complains that she was required to fill out forms for these incidents while other, younger employees were not.  These incidents were also referenced in her evaluation for the relevant time period.  Two, Plaintiff alleges that her termination itself was age discrimination.

On Plaintiff's first age discrimination contention, she suffered no adverse employment action, and thus fails to make a prima facie case.  An adverse employment action is "a tangible change in working conditions that produces a material employment disadvantage."  *Spears v. Missouri Dept. of Corr. and Human Resources,* 310 F.3d 850, 853 (8th Cir. 2000).  A negative evaluation is not adverse for purposes of the ADEA.  *See Zhuang v. Datacard Corp.*, 414 F.3d 849 (8th Cir. 2005).  Plaintiff's filing of a form 191 and the mention of the incidents on her evaluation are the only matters she alleges were adverse employment actions relating to her sleeping and tardiness.  She agrees that no disciplinary action was taken against her, and clearly the record bears this out.  While the 191 form may at times be a precursor to disciplinary action it is not, in and of itself, an adverse employment action.  Nothing in the record demonstrates that there was any material change in her employment or any employment disadvantage from these incidents and her employer's responses.

As to Plaintiff's second age discrimination allegation, she alleges she was terminated in

13

violation of the ADEA. Defendants claim Plaintiff was terminated for failing to cooperate in her fitness for duty evaluation by providing the requested medical records to Dr. Harris. This claim too is ripe for summary judgment. As with her first ADEA claim, Plaintiff does not appear to present any direct evidence of discrimination. Even if Plaintiff could meet the elements of a discriminatory discharge under the ADEA, she can not show that the legitimate, nondiscriminatory reason for her discharge as proffered by her employer was a pretext.

The Court questions in the first instance Plaintiff's ability to show she was meeting the legitimate expectations of her employer, as she was refusing to cooperate in the fitness for duty evaluation. However, even assuming that Plaintiff was meeting the expectations, the record shows absolutely no evidence of similarly situated employees who were asked to submit medical records and refused, but were not terminated. *See Rogers v. U.S. Bank, N.A.*, 417 F.3d 845 (8th Cir. ). A method to demonstrate pretext is by showing that similarly situated persons under the age of forty received more favorable treatment. *Cherry*, 361 F.3d at 479. In order to be similarly situated, these individuals must "have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Id.* (quoting *EEOC v. Kohler Co.,* 335 F.3d 766, 775 (8th Cir.2003)). In this case, Plaintiff did not present evidence that a similarly situated individual was treated differently in respect to termination.

Plaintiff does allege disparate treatment in relation to other disciplinary actions that were not the basis for her termination. She alleges a pretext is supported because the 191 Form that Plaintiff was told to fill out regarding her tardiness to a staff meeting was not required of a male employee who had been late, although Hargarten represented to Plaintiff that the male employee was treated similarly. However, the 191 form did not serve as any basis for the proffered reason for termination

14

-- Plaintiff's failure to comply with requests for her medical records. Although evidence of disparate treatment can support a claim of pretext, the plaintiff must prove that she and the younger employees were "similarly situated in all relevant respects." *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 972 (8th Cir.1994). The plaintiff, however, has offered no evidence that she was "similarly situated" to the employees whom she asserts were disciplined less severely. Indeed, it is clear from the record that she held a different position with different responsibilities.

Moreover, to satisfy her burden in establishing that defendant's proffered reason is a pretext, the plaintiff must produce evidence that is capable of proving that the real reason for her termination was age discrimination. *Nelson v. Boatmen's Bancshares,* 26 F.3d 796, 801 (8th Cir.1994). Proof that the defendant's explanation is false or incorrect does not, by itself, demonstrate a pretext for discrimination. *Hutson v. McDonnell Douglas Corp.,* 63 F.3d 771, 777 (8th Cir.1995). Plaintiff's evidence must "create an inference of age discrimination such that reasonable minds could agree that age discrimination was the 'determining' factor in the adverse employment action." *Clements v. General Accident Insurance Company of America,* 821 F.2d 489, 491 (8th Cir.1987) quoting, *Tribble v. Westinghouse Electric Corp.,* 669 F.2d 1193, 1196 (8th Cir.1982), *cert. denied,* 460 U.S. 1080 (1983). The evidence in the record does not connect Plaintiff's age to her termination. Plaintiff has failed to meet her burden and summary judgment is due to be granted on this point.

### C. Gender Discrimination

Title VII gender discrimination actions have well-established rules for allocating the burdens of production and persuasion to the parties. Under the *McDonnell Douglas* analysis, the elements of a prima facie discrimination claim are: 1) the employee belonged to a protected class; 2) she was qualified to perform her job; 3) she suffered an adverse employment action; and 4) she was treated

15

differently from similarly situated males. *Hesse,* 394 F.3d at 631. The fourth element of a prima facie discrimination case also can be met if the employee provides "some other evidence that would give rise to an inference of unlawful discrimination." *Putman v. Unity Health Sys.,* 348 F.3d 732, 736 (8th Cir.2003). Once an employee establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions, and then shifts back to the employee to show that the employer's reason was pretextual. *Hesse,* 394 F.3d at 631.

If the plaintiff succeeds in establishing a prima facie case, a rebuttable presumption is created; the defendant must then advance a legitimate, nondiscriminatory reason for the discharge. *St. Mary's Honor Center,* 509 U.S. at 506-08. If the defendant does so, then the plaintiff must demonstrate that the proffered reason was not the true reason for the discharge. *Id.* "Plaintiff must ... establish the existence of facts which if proven at trial would permit a jury to conclude that the defendant's proffered reason is pretextual and that intentional discrimination was the true reason for the defendant's actions." *Krenik v. County of Le Sueur,* 47 F.3d 953, 958 (8th Cir.1995) (citing *St. Mary's Honor Center,* 509 U.S. at 506-08).

Plaintiff cannot establish a prima facie case of discrimination because she has not presented evidence that would give rise to an inference of unlawful discrimination. She attempts to meet this fourth element of the prima facie burden by showing that she was treated differently from similarly situated males. This requires evidence that Plaintiff and her male co-workers "were 'involved in or accused of the same or similar conduct and [were] disciplined in different ways.' " *Rodgers v. U.S. Bank, N.A.,* 417 F.3d 845, 852 (8th Cir.2005) (quoting *Wheeler v. Aventis Pharms.,* 360 F.3d 853, 857 (8th Cir.2004)). However, Plaintiff only presents conclusory statements that other males slept on the job and were not required to submit 191 forms and that a male was not required to submit a

Case 4:04-cv-00626-RED   Document 106   Filed 01/05/06   Page 16 of 21

191 form for tardiness to a meeting. There is nothing submitted by Plaintiff to show that the males were similarly situated to her.

Moreover, there is nothing presented to show any adverse employment action was made regarding the filling out of the 191 form, as discussed in the discussion above regarding Plaintiff's age discrimination claim. As to Plaintiff's termination, there is no evidence connecting this incident to Plaintiff's gender. Thus, summary judgment is due to be granted on this point.

### D. Retaliation Claim

Plaintiff further claims that Defendants retaliated against her in violation of the ADA, ADEA, and Title VII after she threatened to and finally filed a formal grievance. Plaintiff claims that the retaliation took on several forms including the requirement for her to fill out the 191 forms, advertising her position as open, the FFD examination, and her subsequent termination. Because Plaintiff presented no direct evidence of retaliation, the Court follows the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-03 (1973). *See Eliserio v. United Steelworkers of Am. Local 310,* 398 F.3d 1071, 1078 (8th Cir. 2005). Under this burden-shifting framework, the plaintiff first must demonstrate a prima facie case of retaliation. *Id.* If the plaintiff presents a prima facie case of retaliation, the burden shifts to the employer to rebut the plaintiff's prima facie case by articulating a legitimate, non-discriminatory reason for its adverse employment decision. *Id.* If the employer successfully makes this showing, the burden shifts back to the plaintiff to show the employer's proffered reason was a pretext. *Id.*

To establish a prima facie case of retaliation, Plaintiff must show (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) a causal connection between the protected activity and the adverse employment action. *Tolen v. Ashcroft,* 377 F.3d 879,

883 (8th Cir. 2004). The defendant then may rebut the plaintiff's prima facie "case by advancing a legitimate, non-retaliatory reason for the adverse" action it took against the plaintiff. *Rheineck v. Hutchinson Tech., Inc.,* 261 F.3d 751, 757 (8th Cir. 2001). "If the defendant makes this showing, the plaintiff must" demonstrate the defendant's proffered reason was a pretext for illegal retaliation. *Id., see also Shanklin v. Fitzgerald,* 397 F.3d 596 (2005), 603- 04 (8th Cir. 2005).

As already stated above, many of Plaintiff's alleged "adverse" actions, do not meet the legal definition of adverse employment actions, including the issue regarding the 191 forms. Even assuming that some of the other actions mentioned by Plaintiff rise to the level of adverse employment actions, she can not establish any causal connection between them and her grievances.

Plaintiff filed her grievance on July 11, 2001 and her position was listed as open on July 11, 2001. However, Plaintiff shows no evidence that Defendants knew of her grievance at the time of posting the job as open. Without the knowledge, it is difficult to establish that the action of posting Plaintiff's job as open was retaliatory. *See Wolff v. Berkley, Inc.*, 938 F.2d 100, 103 (8th Cir. 1991) (finding lack of knowledge on behalf of employer established that action could not have been in retaliation of employee's statutorily protected activity). Additionally, Plaintiff's termination did not occur until five months after her July 11 grievance. *See Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 761 (8th Cir. 2004).

Moreover, on the whole, there is no evidence establishing a causal connection between any of Plaintiff's alleged protected activities and the alleged retaliatory conduct. There is nothing connecting the placement of her in the sick pool (indeed Plaintiff was placed in the pool prior to her grievance), the FFD examination request, the request for her medical records, or her termination with any of her complaints or grievances.

18

Additionally, even if there was a causal connection, for the reasons stated above, Plaintiff has not produced any evidence to support that the acts were a pretext for retaliation. Instead, the Defendant has proffered a legitimate, nondiscriminatory reason for why Plaintiff was terminated. This reason has not been rebutted by Plaintiff.

Plaintiff argues that Dr. Harris has refused to return many employees to work status who refused to provide him with medical records and Plaintiff was the only person actually terminated for this act. However, Plaintiff again fails to demonstrate who these other persons were and if they are similarly situated to Plaintiff. Additionally, Plaintiff argues the 191 Forms help demonstrate a pretext, however these Forms were completed in July and August of 2000, almost a year before Plaintiff's termination. The remoteness in time of these forms and Plaintiffs termination coupled with the fact the forms had no relation to the decision to terminate Plaintiff cut against a finding of pretext. *See Erenburg v. Methodist Hosp.*, 240 F.Supp.2d 1022, 1033 (D. Minn. 2003) (applying the same analysis in regard to comments made by employer). Thus, summary judgment is due to be granted on this point.

### E.  Invasion of Privacy

Plaintiff's final claim is that Defendants invaded her privacy under Missouri state common law. Specifically, Plaintiff makes a claim based upon unreasonable intrusion upon the seclusion of another. The elements for this action are as follows: 1) the existence of a secret and private subject matter; 2) a right in the plaintiff to keep that subject matter private; and 3) the obtaining by defendant of information about that subject matter through unreasonable means. *St. Anthony's Medical Center v. H.S.H.*, 974 S.W.2d 606, 609-10 (Mo. App. 1998) (citations omitted).

As a primary matter, the Court questions whether Plaintiff can establish that the medical

19

records regarding her infertility treatments were indeed private subject matter. Plaintiff had openly talked with co-workers, including Hargarten, about her treatments. Moreover, as to Dr. Harris, Plaintiff had revealed her treatments on the initial questionnaire she filled out for Dr. Harris. Assuming, without deciding, that Plaintiff has established the first two elements of unreasonable intrusion into the seclusion of another, Missouri law is clear that Plaintiff has not met the third element.

The Defendants in this case did not ever receive the subject matter, except through Plaintiff's attorney as part of settlement negotiations. It is clear that the Defendant must actually obtain private information to establish a prima facie case. *Hester v. Barnett*, 723 S.W.2d 544, 563 (Mo. Ct. App. 1987) (finding that the defendant must actually obtain private information or obtain access to a private matter through unreasonable means). Moreover, unreasonable means is an essential element and includes things such as pretense or deception. If the records are obtained in the ordinary course or business or produced in response to discovery then the Plaintiff has not established the use of unreasonable means. *St. Anthony's Medical Center*, 974 S.W.2d at 610 (stating that plaintiff could not prevail on invasion of privacy claim where records were obtained through ordinary course of business and produced in response to discovery in divorce action); *see also Brown v. Mullarkey*, 632 S.W.2d 507, 510 (Mo. Ct. App. 1982) (finding that plaintiff could not prevail on intrusion upon seclusion of another claim where information was obtained through subpoena duces tecum).

Plaintiff argues that the act of attempting to obtain information regarding Plaintiff's past use of antidepressant medication was in and of itself an intrusion, and thus the ultimate acquisition of the information is not required, relying upon *Doe by Doe v. B.P.S. Guard Servs., Inc.*, 945 F.2d 1422 (8th Cir. 1991). In *B.P.S.*, the Defendants had videotaped female models in a dressing room,

Case 4:04-cv-00626-RED   Document 106   Filed 01/05/06   Page 20 of 21

however there was no evidence that the videotaping caught any of the models in a state of undress. Plaintiff argues that pursuant to *B.P.S.*, it does not matter if Defendants actually obtained the material they sought, since the intrusion occurred when Defendants requested the records.

The Court finds that *B.P.S.* is not as applicable as Plaintiff may wish. The court in *B.P.S.* stated that "[s]o long as there was an objectionable intrusion into the plaintiffs' enjoyment of an area in which the plaintiffs had a right and expectation of privacy, it is not necessary to the plaintiffs' cause of action that they be viewed in a state of undress." *Id.* at 1427 (citations omitted.) In that case, the court found that the act of placing the video cameras in the dressing area was an unreasonable intrusion in and of itself. Certainly, that is a much more egregious set of facts than the case at bar where there was merely a request for records. A request, pursuant to a legitimate FFD as stated above, is hardly the sort of unreasonable intrusion required for an invasion of privacy claim. Thus, summary judgment is due to be granted on this claim.

### IV. Conclusion

Due to the foregoing discussion, Defendant's Motion for Summary Judgment (Doc. 76) is hereby **GRANTED** as to all counts and claims alleged in Plaintiff's Second Amended Complaint.

**IT IS SO ORDERED.**

DATED:      January 5, 2006           */s/ Richard E. Dorr*
                                           RICHARD E. DORR, JUDGE
                                           UNITED STATES DISTRICT COURT

Case 4:04-cv-00626-RED   Document 106   Filed 01/05/06   Page 21 of 21